YATES, Judge.
Frank Skelton sued his employer, Uniroyal Goodrich Tire Company, Inc., on July 11, 1994, seeking to recover workers’ compensation benefits for an injury he had sustained to his lower back on December 6, 1993, during the course of his employment. Following an ore tenus proceeding, the trial court, on February 12, 1996, found that Skelton had not proved medical causation and entered an order denying benefits. Skelton appeals.
At the outset, we note that because of the date of Skelton’s injury this ease is governed by the new Workers’ Compensation Act. The new Act provides that an appellate court’s review of the proof and consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(l), Ala. Code 1975. It further provides that when an appellate court reviews a trial court’s findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25 — 5—81(e)(2), Ala.Code 1975. Our supreme court “has defined the term ‘substantial evidence,’ as it is used in § 12-21 — 12(d), to mean ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’” Ex parte Trinity Industries, Inc., 680 So.2d 262, 268 (Ala.1996), quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Further, we “will view the facts in the light most favorable to the findings of the trial court.” Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994). This court has also concluded: “The new Act did not alter the rule that this court does not weigh the evidence before the trial court.” Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).
The record indicates that Skelton had had a history of problems related to his lower back before his December 1993 on-the-job injury. In 1983, Skelton was diagnosed with colon cancer and underwent a colostomy, which resulted in the removal of a large portion of the muscles that supported his back and spine. During the period March 14, 1989, through May 5, 1989, Dr. Dwight Agee, a chiropractor, treated Skelton 12 times with heat and spinal manipulation for pain in his lower back, his neck, and his left foot. Skelton returned to Dr. Agee for four additional treatments between September 1989 and November 1989. Dr. Agee testified that Skelton improved with treatment.
Skelton’s job duties as a quality assurance inspector regularly included lifting tires. In March 1993, he returned to Dr. Agee, complaining of mid- and lower-back pain. He stated that the onset of pain was gradual, following his lifting tires at work, and that sitting, sleeping, or riding in a car made the condition worse. It was noted at this time that Skelton had a fixated right SI joint in the pelvis and that he had lost his normal range of motion in the pelvis; this problem in the joint had caused the right leg to be shorter than the left leg. Dr. Agee testified that this condition could cause a person to have back problems. It was further noted that Skelton had a fixated vertebra at the L3 through the L5; this problem resulted in the loss of the normal range of motion in the lumbar area. Skelton missed two days of work at that time. He was treated by Dr. Agee on 17 different occasions between March 8, 1993, and May 11, 1993, for mid- and lower-back pain.
On December 6, 1993, Skelton lifted a 70-pound tire from a pallet and, while turning to place it on the inspection table, he felt a sudden, sharp pain in his lower back; the pain caused him to fall to his knees. He reported the incident to his supervisor and went to the company dispensary. Skelton was initially seen for this injury by Dr. Phillip Bobo on December 7, 1993, who diagnosed Skelton with a lumbar strain. Dr. Bobo prescribed physical therapy and medication for pain and inflammation, and placed him on light work duty. Dr. Bobo next saw Skelton on December 9, 1993. An MRI revealed that Skelton had a bulging disc at the L5-S1. The MRI also showed some degenerative changes in Skelton’s spine at the L5-Sl. Skelton was seen again by Dr. Bobo on December 13, 1993. At that time, he was *97 still complaining of pain and he stated that he “was not much better.” Dr. Bobo continued him on physical therapy and light work duty. Skelton returned to Dr. Bobo on December 16, 1993, indicating that he was “much better.” Dr. Bobo noted that Skelton had responded well to physical therapy and had a full range of motion in his back. He returned Skelton to work at full duty on December 17,1993.
During the time that Skelton was under the care of Dr. Bobo, he was also being treated by Dr. Agee. He was first seen by Dr. Agee, for the December 6 injury, on December 10, 1993, complaining of lower back pain that radiated down the right leg. Dr. Agee diagnosed Skelton with lumbar strain/sprain, intervertebral disc syndrome, and early spinal osteoarthritis. Dr. Agee stated that “intervertebral disc syndrome” is a term used to describe the problem caused by a disc that has been injured or that is otherwise not functioning properly. He treated Skelton with spinal manipulation. Following the initial visit, Skelton returned to Dr. Agee on numerous occasions between December 1993 and April 1994 with lower-back pain and sporadic episodes of mid-back pain and pain in the left hip and leg. Although his pain fluctuated from mild to severe, he, nevertheless, complained of lower-back pain on each visit.
On January 17, 1994, Dr. Agee diagnosed Skelton with a new condition known as thoracic segmental dysfunction. This condition occurs when the vertebrae in the thoracic spine become misaligned and cause pain. Dr. Agee stated that Skelton had reported no new incident of injury at work. On January 28, 1994, Skelton returned to Dr. Agee, stating that the pain had increased after working a 12-hour shift the previous night and that he was “hurt[ing] pretty bad.”
Skelton returned to Dr. Agee on February 4, 1994, stating that he had “pulled his back out” after cutting firewood and loading and unloading his truck; he did not attribute his pain increase to any employment-related activity. Dr. Agee gave him a new diagnosis of lumbar sprain/strain, thoracic sprain/strain, and muscle spasm. On February 28, 1994, Skelton returned to Dr. Agee, complaining of an increase in pain after doing yard work over the weekend. Dr. Agee again diagnosed Skelton with lumbar and thoracic sprain/strain.
On April 18, 1994, Dr. Agee told Skelton that he could return for treatment on an “as-needed basis only.” Skelton was next seen by Dr. Agee on April 29,1994. At this time, he was complaining of extremely severe pain in the left hip, lower back, and left leg. He stated that the pain had increased 10 days earlier “for reasons unknown.” Dr. Agee gave him a new diagnosis of lumbar interver-tebral disc syndrome, ongoing lumbosacral mechanical back strain/sprain, and early spinal osteoarthritis.
Because of the severity of the pain Skelton was experiencing, he saw his family physician, Dr. Larry Skelton, on April 29,1994. A physical examination indicated that Skelton had a herniated disc. An MRI, performed on May 2,1994, confirmed that Skelton had a herniated disc at L5-S1; this problem caused impingement on the L5-S1 nerve root. This was the first instance in which Skelton was diagnosed with a herniated disc. Dr. Skelton took him off work and referred him to Dr. Evan Zeiger.
Dr. Zeiger saw Skelton on May 9, 1994. Following an examination, Dr. Zeiger agreed that Skelton was suffering from a herniated disc that resulted in impingement on the L5-S1 nerve root. Dr. Zeiger performed a mi-crosurgical lumbar diskectomy on Skelton on May 12, 1994. A follow-up MRI revealed that the surgery had been successful and that the disc was no longer herniated. On June 30, 1994, however, Skelton returned to Dr. Zeiger complaining of an increase in pain. A myelogram confirmed that Skelton had a recurrent herniated disc at the L5-S1. Dr. Zeiger performed a second microsurgical lumbar diskectomy on July 5, 1994, to repair the disc. Skelton returned to Dr. Zeiger on October 24, 1994, and, because he was not responding well to therapy, an additional my-elogram was performed. It revealed another recurrent herniated disc at the L5-S1. Dr. Zeiger performed a third microsurgical lumbar diskectomy to repair the disc. Skelton was last seen by Dr. Zeiger on February 6, 1995. At that time Skelton was having less *98 pain; Dr. Zeiger' noted that he had reached maximum medical improvement, but that he was unable to perform his job duties at Uniroyal because of the condition of his back.
Skelton was seen by Dr. Michael Gibson, a pain management specialist, in October 1995. Following an examination, Dr. Gibson noted that Skelton had a severely degenerated disc at the L5-S1, and that, as a result of the herniations and surgeries, the vertebrae in Skelton’s back were unstable. Dr. Gibson stated that it would be unlikely that Skelton would ever be able to perform work that required any type of lifting or heavy labor. Dr. Gibson treated Skelton’s pain with lumbar steroid injections and pain medications, and he stated that Skelton responded well to this treatment. Dr. Gibson further stated that at some point Skelton would need a lumbar fusion.
At the time of the hearing, Skelton had not worked at Uniroyal since May 1, 1994. He had received sickness and accident benefits from Uniroyal from May 1, 1994, through March 31, 1995. Skelton also had received disability retirement benefits from Uniroyal since April 1,1995.
For an injury to be compensable under our Workers’ Compensation Act, the employee must establish both legal and medical causation. Ex parte Moncrief, 627 So.2d 385 (Ala.1993). “Once legal causation has been established, i.e., once it has been established that an accident arose out of and in the course of employment, medical causation must be established, i.e., that the accident caused the injury for which recovery is sought.” Id., at 388. To establish medical causation, an employee must produce substantial evidence tending to show that the exposure to the risk or conditions was in fact a contributing cause of the injury. Ex parte Trinity Industries, Inc., 680 So.2d 262 (Ala.1996); Ex parte Valdez, 636 So.2d 401 (Ala.1994). Medical causation may be found by the trial court without testimony from medi cal doctors. Ex parte Price, 555 So.2d 1060 (Ala.1989). The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, A Division of USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ.App.1993). Finally, we are mindful that the Workers’ Compensation Act is to be liberally construed to accomplish its beneficent purposes and that doubts must be resolved in favor of the employee. Holmes v. Gold Kist, Inc., 673 So.2d 449 (Ala.Civ.App.1995). The parties stipulated to legal causation, i.e., that Skelton’s December 6,1993, accident occurred within the line and scope of his employment; therefore, the only issue before this court is whether Skelton proved medical causation.

Evidence of Medical Causation

Dr. Bobo testified that one-third of the population have bulging discs and that bulging discs have no real clinical significance. He stated that persons with bulging discs are able to work in a full range of jobs, including strenuous jobs, without restrictions. He further stated that most bulging discs are the result of normal “wear and tear” on the body, especially as one ages and becomes deeonditioned, and that any activity could result in a bulging disc. He added that most bulging disc do not rupture. Dr. Bobo also testified that there is no way to determine from an MRI how long Skelton’s bulging disc had been present and that it could have been present for years. Dr. Bobo farther testified that any extreme physical exertion or strenuous activity, including spinal manipulations by a chiropractor, could cause a bulging disc ultimately to herniate. Finally, Dr. Bobo testified that the work activity Skelton was involved in could cause a disc to bulge and herniate.
Dr. Agee testified that it is difficult to determine at what point and to what extent a disc becomes injured, and that one must look to a patient’s history, including the periods when the onset of pain occurs, to aid in that determination. He stated that his diagnosis of lumbar strain/sprain and intervertebral disc syndrome on December 10, 1993, was consistent with Skelton’s December 6 injury. Dr. Agee further testified that after reviewing Skelton’s MRI of December 9, 1993, and after having treated him from 1989 to 1993, he concluded that Skelton’s injury “did not help the man’s back but was not the complete one main event” requiring treatment from December 1993 until May 1994. Dr. Agee *99 also testified that Skelton’s employment "with Uniroyal eould have been a contributing factor to the ultimate herniation of Skelton’s disc in April 1994. Finally, Dr. Agee denied that his treatment of Skelton with spinal manipulation caused the disc to herniate, stating that it is extremely rare for a bulging disc to herniate as a result of spinal manipulation.
Dr. Larry Skelton testified that any type of strain or manual labor could cause a disc to bulge or herniate. Dr. Skelton was asked to assume that Skelton had not complained of back pain before December 1993 to the point that it caused him to be absent from work; that while handling a tire at work he experienced a sudden sharp pain in his back; that an MRI showed a bulging disc; that he missed several days of work, but had returned to work and resumed his normal duties; and that while continuing to handle tires at work he experienced an increase in pain in April 1994 that extended into his left hip and leg. Dr. Skelton stated that those facts were consistent with Skelton’s injuries to his back, i.e., the herniated disc, and that it was related to Skelton’s employment.
When asked on cross-examination whether, if Skelton had reported back pain before December 1993, it was possible that he had had a bulging disc before that time, Dr. Skelton stated that it was possible. He eould not state with any reasonable degree of medical certainty that the bulging disc discovered in December 1993 was caused from Skelton’s employment with Uniroyal. When asked to assume, in addition to the other facts, that Skelton had reported an increase in the pain in his back after cutting and loading firewood in February 1994, Dr. Skelton could not state with any reasonable degree of medical certainty that the herniated disc had occurred as a result of Skelton’s employment.
Dr. Zeiger testified that the herniated disc revealed by the May 2,1994, MRI represented a definite change from the previously diagnosed bulging disc and was a natural process of the original disc injury. Dr. Zeiger stated that, based on Skelton’s stated history regarding the accident on December 6, 1993, and on his physical examination of Skelton, he concluded that the initial injury produced damage to Skelton’s disc and that the disc had protruded. He further stated that when Skelton’s pain increased, the disc had protruded to the point that it herniated. Dr. Zeiger also testified that, based on Skel-ton’s stated history regarding the accident, he thought the injury was work-related.
On cross-examination, Dr. Zeiger testified that there is no way to determine from the MRI of December 1993 how long the bulging disc had been present and that if Skelton had had a history of low back pain before December 1993 it was possible that the bulging disc had been present before that time. He stated that there was no way to determine if Skelton’s bulging disc was caused by his employment at Uniroyal. Dr. Zeiger testified that Skelton’s colostomy and deeondi-tioned abdominal muscles made him more susceptible to both a bulging disc and a herniated disc. Dr. Zeiger also testified that spinal manipulations performed by a chiropractor could complicate a bulging disc. Dr. Zeiger further testified that it was possible that Skelton had ruptured the disc when cutting and loading firewood and performing other yard work, and that he could not determine with a reasonable degree of medical certainty that Skelton’s injury was related to his employment.
On re-examination by Skelton’s attorney, Dr. Zeiger was asked to assume the following history: that Skelton had not experienced any significant pain or discomfort in his back before December 1993, but that in December 1993, after handling a tire at work, he felt a sudden sharp pain in his back; that he missed several days of work, but later returned to work, and continued his normal activities, yet continued to have pain; and that ultimately the pain increased and moved into his hip and leg. Dr. Zeiger stated that this history is consistent with both the bulging disc and the herniated disc revealed by the MRIs taken in December 1993 and May 1994.
Skelton testified that before December 1993 he had had problems with his back, which consisted of muscle spasms, muscle ache, and muscle tension, and that he had sought treatment for these conditions, but had never been diagnosed with a condition *100 involving the disc in his lower back and had never missed any significant amount of time from work because of an injury to his lower back. He stated that following his visits with Dr. Agee in May 1993, he did not seek any treatment for his back until after the accident at work in December 1998. Skelton testified that the pain he experienced on December 6,1993, after having lifted the tire at work, was distinctly different from the pain he had previously experienced in his back. He described the previous pain as a “muscle ache;” however, he described the pain that he experienced after lifting the tire at work as a “sharp, burning pain.” Skelton returned to work at Uniroyal in his normal job duties; although his back had improved, he continued to experience pain. He stated that the pain would increase following periods of activity, such as cutting firewood, but that it was most severe following the completion of a shift at Uniroyal. Skelton testified that he had not been without pain in his back since the accident. :
In U.S. Steel, supra, 634 So.2d 134, the employee testified that he received a blow to his thumb in the course of his employment and that the blow resulted in his experiencing severe pain. He reported the injury to his supervisors and sought immediate medical treatment. The' employee’s physician performed exploratory surgery on the thumb and discovered that the employee had “serous material” and poor circulation in the thumb. The employee experienced complications with the thumb, had several surgeries performed on it, and eventually had to have it amputated. The physician testified that the employee suffered from a preexisting arteriosclerotic disease, which caused him to have poor circulation throughout his body, and that that was the reason the thumb had to be amputated. When questioned concerning the cause of the incident, the physician stated that “there’s no way for us to tell what brought this episode on” and that “minor trauma potentially in arteriosclerotic disease could potentially cause it.” Id., at 136. The physician did not credit the incident at work as described by the employee as the cause of the medical problem. This court held that the totality of the circumstances of that case supported a finding of medical causation, stating:
‘While there was evidence that [the employee] had pre-existing arteriosclerotic disease, there was no evidence presented that his condition affected his ability to perform his work for U.S. Steel. [The employee’s] testimony concerning the accident, including how it occurred, the onset of the symptoms, and his immediate request for medical treatment, substantiated his claim that the precipitating cause of his resultant amputation was the steel band hitting his thumb on October 15, 1991.”
Id., at 136 (citation omitted).
The evidence indicated that the type of work activity Skelton was involved in at Uniroyal could cause a disc to bulge. We note, however, that it could not be determined from the evidence how long Skelton’s bulging disc had been present, and that because of Skelton’s prior history of back pain it was possible that Skelton’s bulging disc had existed before December 1993. Also, because of Skelton’s physical condition following his colon cancer and colostomy, his back was weakened and he became more susceptible to a bulging or herniated disc. However, there was no evidence presented that either condition affected his ability to perform his work for Uniroyal. An employee is not precluded from collecting workers’ compensation benefits even though he has a preexisting condition, if the employment aggravates, accelerates, or combines with, a latent disease or infirmity to produce disability. Dunlop Tire Corp. v. Allen, 659 So.2d 637 (Ala.Civ.App.1995). “A preexisting condition that did not affect the employee’s work performance before the disabling injury is not considered, pursuant to the Act, to be a preexisting condition.” Id., at 639.
Skelton had no pain in his back and sought no treatments for his back for approximately seven months before December 6, 1993. On that date, while lifting a 70-pound tire at work, he experienced a sudden, sharp pain in his lower back that caused him to fall to his knees. Skelton immediately reported the accident and sought medical treatment. He testified that this pain was unlike any other back pain he had experienced. A subsequent *101 examination for a herniated disc was negative; however, an MRI revealed a bulging disc at the L&-S1. Skelton returned to work, and, although the severity of the pain fluctuated, he had continuous back pain from the date of the accident until April 1994, when the pain became more severe and spread into his hip and leg. A second examination and MRI revealed a herniated disc at the L5-S1.
The medical testimony was that any strenuous or physical activity, including the employment Skelton was involved in, could cause a bulging disc to rupture and that it was possible that Skelton’s employment with Uniroyal caused his disc to bulge and herniate. Skelton reported increased-pain in his back after cutting and loading firewood and doing yard work; however, this occurred in February 1994, approximately two months before Skelton’s reported increase in pain in his lower back, hip, and leg, and the diagnosis of the herniated disc in late April and early May 1994. There was testimony that chiropractic treatments could cause a bulging disc to herniate; however, Dr. Agee stated that it is extremely rare for that to occur. The one activity that Skelton was consistently involved in before he reported an increase in pain and before the herniated disc was diagnosed was his employment at Uniroyal. He stated that his pain was most severe following the completion of a shift at Uniroyal.
Finally, although there was some medical testimony to the effect that Skelton’s herniated disc could not be attributed to his employment with Uniroyal with a “reasonable degree of medical certainty,” there was medical testimony that Skelton’s history was consistent with the injuries sustained to his back and that the injuries were employment-related. Further, no physician testified that Skel-ton’s accident on December 6, 1993, was not a factor contributing to the injury to his back.
After carefully considering the totality of the evidence and circumstances of this ease, along with the principles of law set out above, we conclude that Skelton proved that his employment was at least a factor contributing to his injury, and, thus, that he established medical causation. Nelson, supra; Ex parte Trinity Industries, supra. Accordingly, the judgment is reversed and the case is remanded for the trial court to enter an order finding medical causation.
REVERSED AND REMANDED WITH INSTRUCTIONS.
MONROE, J., concurs specially.
ROBERTSON, P.J., concurs in the result only.
CRAWLEY and THOMPSON, JJ., dissent.